## CIRCUIT COURT OF BALTIMORE CITY.

Filed June 11, 1915.

MARY C. HOULTON
VS.
SAMUEL S. HOULTON.

*Eugene O'Dunne* for plaintiff.
*John Phelps* for defendant.

AMBLER, J.—

The bill of complaint in this case, which was filed by the wife on June 22, 1914, alleges that from the time of the marriage on October 10, 1906, the life of the complainant with the defendant had been unhappy and that on two previous occasions she had instituted proceedings for separation in the equity courts of this city, the first in Circuit Court No. 2 on August 9, 1907, and the second in this Court on June 9, 1910, but each had been discontinued upon a temporary reconciliation; that shortly after the second reconciliation constant differences again arose from the husband's failure to make any provision for the support of the family, and in the course of a few months she found it necessary to seek some means of earning a livelihood for herself and their infant child; and to that end, on March 3, 1911, with the knowledge and consent of her husband, she went to the home of her married sister in New York to study designing, taking with her the infant child, then about three years old, her husband promising to contribute five dollars a week for its support, which promise he wholly failed to keep; and that ever since said March 3, 1911, the defendant has abandoned the complainant and such abandonment has been uninterrupted for over three years and is deliberate and final and the separation of the parties beyond any reasonable expectation of reconciliation. The bill prays for an absolute divorce and custody of the child.

At the time of their marriage the complainant was not quite 17 years old and the defendant was in his thirty-fourth year.

The husband's answer denies all the material allegations of the bill and the wife's right to any relief, insisting, with great detail, that the desertion was her own act and the separation due entirely to her own fault. Testimony was taken in open Court in December, 1914, and the hearing lasted for more than a week. At its conclusion the complainant filed a petition stating that, owing to her attendance in Court for so many days, she had lost the position which had been paying her twenty-five dollars a week and found it difficult to obtain other employment, and asking "the enforcement of Equity Rule No. 35 as interpreted in this Court for more than ten years," to the effect that on the defendant's failure to provide for a stenographer, the Court should decide the case on plaintiff's testimony. Thereupon, an order was passed on December 23, 1914, awarding temporary custody of the child to the complainant and requiring the defendant, in addition to the alimony pendente lite previously allowed by another Judge, to pay her five dollars a week for its maintenance until the final determination of the cause, which was left to await the transcribing of the stenographer's notes. This was followed by several interviews with counsel for

both parties and by repeated visits to the Court from the defendant himself. Counsel for the complainant represented that, because of the difficulty of finding employment in Baltimore, the complainant desired to return to New York, where she had for some time earned regularly from twenty to forty dollars a week; but the defendant and his counsel vigorously opposed the child's removal beyond the jurisdiction of this Court. On January 15, 1915, an order was signed, as follows:

"Whereas, upon the petition of complainant and representation by her counsel of record, it appears that she lost her position during the trial of this case, and it is further represented to the Court that she has not been able to obtain employment in Baltimore City, and whereas the Court has suggested that the amount of alimony pendente lite to be paid by the defendant to the complainant for her support and the support of her minor child be increased to fifteen dollars ($15.00) a week, and whereas the defendant has orally expressed his willingness to pay said sum:

"It is thereupon, this 15th day of January, 1915, by the Circuit Court of Baltimore City, adjudged and ordered that the defendant pay to the complainant, as alimony pendente lite, and for the support of their minor child, the sum of fifteen dollars ($15.00) per week accounting from the 5th day of January, 1915; and that the order of this Court of December 23rd, 1914, in so far as it affects the question of custody of said child and of access of the defendant thereto, be, and the same is hereby, affirmed; and the plaintiff be, and she is hereby, enjoined and restrained from taking or removing said child beyond the limits of the State of Maryland; but if the defendant fails to make prompt payment of any weekly instalment so ordered before the end of the week for which the same is or shall become due, then and in that event the plaintiff shall have the right, and is hereby permitted, until the further order of this Court, to take the said child to any place within the United States of America where she can, by the exercise of her art, earn a livelihood; provided always, that, whether within or without the State of Maryland, the plaintiff shall at all times keep this Court advised of the whereabouts of her child and shall per-

mit the defendant to have access to the said child at reasonable hours as required by the order passed in this cause on December 23, 1914, and shall produce the said child in this Court within forty-eight hours after notice to her or her solicitor of an order of Court to that effect; and provided further, that until the further order of this Court whenever and so long as the plaintiff shall have the said child outside of the State of Maryland, the defendant shall be, and is hereby relieved of the obligation to pay for alimony or for the support of the said child anything more than the five dollars per week required by the order passed in this cause on November 12, 1914;

"And it is further ordered that the defendant forthwith pay the cost of the stenographic record in this cause, and in case of his failure to make such payment within thirty days from this date, the Court shall and will proceed to determine this cause on the stenographic record of the testimony offered by the plaintiff at the hearing so soon as the plaintiff shall have the same written up, and filed herein by the official stenographer of the Court."

The defendant complied with this order, not with absolute punctuality, but with tolerable regularity, until the latter part of February, but then the wife, failing, through some mistake or misunderstanding, to receive the weekly instalment at the time when it was expected and doubtless needed, immediately obtained a small loan from a friend, and, with the child, set out for New York in search of employment. From that time the husband paid only five dollars a week until the beginning of May, when there was another attempt at reconciliation. About the 3rd of May she met him in Washington, apparently prepared to accept his proposal that, for the sake of the child, they should go to some unnamed place in the West and there make a fresh start in life amid new surroundings, without acquaintance and without any capital except the small sum that he said he could borrow from his father. According to the husband's statement, on reflection, this seemed to him a wild and foolish plan, and when he met his wife he so told her, and proposed instead that they secure quarters somewhere in Baltimore and live out their lives in this city, where they at least

have acquaintances and some friends. Under the circumstances, it can hardly be wondered that the wife was discouraged by the sudden change of plans and doubted the bona fides of the offer. At all events, the negotiation ended at once, and from that day until the hearing on the first of July, he not only sent her no money at all; but made not the slightest effort to communicate with her in any way; and he gravely explainly this failure by the statement that he did not know how to reach her, as he had given her counsel his only memorandum of her address. The address of the wife from whom he had been parted for more than four years seems to have been about as valuable in the eyes of the defendant as a card handed to him by any stranger whom he happened to meet on the street, and he appeared genuinely surprised by the suggestion that there might be a different view.

No one could have listened to the complainant's testimony without a conviction of her truthfulness and a feeling of the deepest sympathy, which was greatly strengthened by the impression made by the defendant's demeanor throughout the trial and particularly when he was himself on the witness stand. Doubt as to the wife's right to the relief prayed arose only from the question whether her narrative had the "corroboration" required by Section 4 of Article 35 of the Code; and it was hoped that the answer to that question would be found in a careful study of the complete record; but the wife's ill health has disabled her from earning the money needed to pay the stenographer's fee, and the husband declares himself equally unable to provide any part of the three hundred dollars estimated as the cost of "writing up" several hundred pages of stenographic notes.

After waiting more than six months and seeing no prospect of ever obtaining even a partial record of the oral testimony, enlightenment was sought from argument of counsel for the respective parties, and, with that aid, I must proceed to dispose of the case as best I can from my own notes and recollection of the testimony, supplemented by the pleadings and by the letters and other papers filed as exhibits in the several stages of this proceeding. So far as the defendant is concerned, I do this with less apprehension of injustice because I cannot accept his profession of inability to have the testimony written up. He says that his domestic troubles have seriously crippled his practice; but he also says that he has been a practicing physician for ten or twelve years. of good professional standing in the City of Baltimore, and he should have been unusually well equipped at the outset, since after obtaining the degree of M. D. in this country he had the advantage of a post-graduate course in Europe. From April to October of 1914 he was engaged, at a salary of $150 a month over and above expenses, in "lecturing upon the physics, chemistry and therapy of radium," but admits that he never thought of saving or contributing one cent for the support of his wife or child.

For some years he has been at little or no expense on account of his family, and for several months he has considered himself entirely relieved of the charge imposed by orders of this Court. The fact that he was able to pay, and did actually pay, sixty dollars a month for the privilege of keeping his wife. and child confined to the State of Maryland, and then failed to pay anything at all when his wife declined to give him another trial, lends at least some color to her counsel's theory that he can raise money for whatever he desires, and is only unable to pay for that which is not of his own free choice.

The plaintiff's testimony, if sufficiently "corroborated," makes out a clear case of abandonment, uninterrupted for more than three years, deliberate and final, and without any reasonable expectation of a reconciliation. She says that immediately upon her return to her husband after the separation in 1910 he resumed the same course of continual neglect of his family, with frequent outbursts of violent temper and abusive language, and that she and her child were dependent for their support on the bounty of the defendant's father, a gentleman of the highest character and great generosity, but of advanced age and limited means; and that she was at last compelled to seek some honest means of livelihood for herself and her child. Her father-in-law, a witness evidently as conscientious as he was reluctant, practically confirms her statement that she derived her support mainly from him and

also corroborates her account of the defendant's violent temper and abusive language, although he denies that he ever witnessed any act of personal violence or heard abusive language applied directly to her. Another witness, a Mr. Pridham, who had been an intimate friend of both parties and a frequent visitor at their home, testified that on one occasion when he was present the defendant with an oath called his wife the foulest name that can be applied to a woman, which so shocked him that he at once told the defendant that, while he had been his friend, he was also a friend of the wife and could not stand by and hear her spoken to in that way by any man; and that subsequently the plaintiff apologized to him and expressed deep regret for having so completely lost control of himself that he was not responsible for his words. This incident was stoutly denied by the defendant on the witness stand; but little weight can be attached to the denial, in view of the flat contradiction between the defendant's testimony as to other matters and his contemporaneous statements in writing that appear as exhibits in the case.

The defendant says that, without his consent or knowledge and without any cause or justification, the complainant left his home some time in February, 1911, and took the child with her to New York; that he then employed Mr. O'Dunne, with whom he had no previous acquaintance, to regain possession of the child by a writ of habeas corpus or other means; and that, through Mr. O'Dunne's persuasion, Mrs. Houlton was induced to return to Baltimore and a short conference at his office resulted in an agreement satisfactory to all parties. He filed as "Defendant's Exhibit No. 1" the memorandum of this agreement, which is as follows:

"Baltimore, Md., March 3, 1911.

The understanding between Mr. and Mrs. Houlton is that she with the consent of her husband is to go to New York with her married sister and learn designing, for which she has talent and can get a position; and the child shall remain over there for the present and Dr. Houlton shall contribute towards its support five dollars a week. And the absence of Mrs. Houlton in New York shall not be construed

as desertion on her part, and whenever the said Dr. Houlton is able to and does offer me a suitable home and support, I express my willingness to return to such home and will be glad to accept the support.

MARY C. HOULTON,
SAML. S. HOULTON."

The defendant further testified that his wife, finding herself unable to make satisfactory arrangements in New York, within a few days requested him to come and take the child back to Baltimore, which he immediately did; and that the child was well provided for and taken care of until it was again "kidnapped" by its mother about a year later; that since he so promptly took charge of the child himself, there was no occasion ever to send the five dollars stipulated for its support, and he considered himself under no obligation to provide for his wife so long as she chose to remain in New York. The defendant's counsel urged that the "agreement" shows on its face that it had not at that time occurred to any one that the defendant could be accused of desertion. There had been no suggestion of his leaving the common home; but because the wife had actually left the State, there was obvious reason for anticipating a charge of desertion against her. This argument seemed full of force until counsel for the complainant directed attention to the concluding words of the same sentence, which involve a distinct admission that the defendant was not then providing a "suitable home and support" and also an express promise on the part of the wife to return whenever the home and support should be offered.

It is an undisputed fact that from the date of the agreement no such offer was ever made to the wife. On the contrary, the defendant coolly assumed that he was under no obligation as a husband. He not only made no effort to communicate with his wife, but instead of endeavoring to provide a home, he shortly instituted a proceeding to vacate and set aside the only provision that he had ever seriously attempted to make for his wife and child. Evidence was submitted that on June 20, 1911, a little more than three months after the "agreement," the defendant filed in this Court a bill (see Houlton vs. Houlton, 119 Md.

360

180) for the cancellation of a deed by which on October 2, 1909, he had conveyed to his wife in trust the house which had been occupied as their home, but was then encumbered with two mortgages, so that the equity of redemption was of little value. The complainant's letters, written in the meantime and now appearing as exhibits, show the mother's yearning for her child; and a second agreement, evidently of the defendant's own composition, indicates clearly enough the spirit with which her appeals were met. This second "agreement," a copy of which was appended to the defendant's petition of August 29, 1914, for an extension of the time for filing his answer to the bill of complaint until the complainant had purged herself of "contempt by replacing the child in the State of Maryland," was as follows:

"Baltimore, Md., June 26, 1911.

This agreement made this Monday morning of June 26, in the year of our Lord One Thousand Nine Hundred and Eleven:

Witnesseth: That for and in consideration of our mutual affection for our infant son, Samuel S. Houlton, Jr., I, Samuel S. Houlton, do hereby agree to allow my wife, Mary Clark Houlton, the limited custody of the said baby for the period of four days reckoning from this the 26th day of June, 1911.

It is specifically agreed that default in the prompt return of said baby unto the custody of his said father, in Baltimore City, wherein said custody legally remains, on or before the date herein specified, the said Mary C. Houlton doth covenant and agree to relinquish any and all claims to the custody and care of said baby forever.

In witness whereof we herewith affix our hands and seals in the presence of each other.

SAMUEL S. HOULTON (Seal)
MARY CLARK HOULTON (Seal)."

Throughout this proceeding the defendant has displayed an amazing misconception of the obligation of counsel to client, a misconception that seems irreconcilable with any regard for—not to say acquaintance with—the first principles of common honesty. As has heretofore been stated, Mr. O'Dunne, who now represents the complainant in this cause, was first employed by the defendant to regain possession of the child in February, 1911. That employment appears to have ended when the agreement of March 3, 1911, was effected, and there is no suggestion that he has ever to this day received any fee for the service; but on March 5, 1911, Mrs. Houlton wrote him a letter of thanks for his interest "in the straightening out of our tangled domestic affairs," and on March 8, 1911, both wrote and telephoned a request that he get Dr. Houlton to come and take the child. A few weeks later she wrote asking if he would undertake to advise her as her counsel.

The following are specimens of her letters:

"March 5, 1911.
My Dear Mr. O'Dunne:

I should like to have had a few words with you before I left the other day, but I felt it best I should leave with Dr., and say what I had to through the mail. I managed to leave on the 1.35 train and felt lucky in doing so, as I felt that Dr. would probably change his mind, and have some other arrangements to suggest. However, we left each other at the station, and I had a hard time keeping back the tears, as I thought what a failure our short married life had been, but I hope sincerely this is the final break, and I shall give all my time and attention to my studies in order to keep the boy and myself independent of any one and I know I am going to succeed. As I explained to you it is impossible to have the boy with me very long and I am arranging to place him in a suitable place until I feel on my feet, when we will once more join hands for good as he is the only thing I feel I have to live for, and it's more to the success of his future I am looking than to my own. I would not mention to the Dr. my idea of placing the boy somewhere, as he would not understand and I feel sure you do. So I shall just go ahead with the arrangement best suited to myself. I want to thank you again for all your goodness and I feel grateful for the interest you have taken in the straightening out of our tangled domestic affairs, and I think you have aided in bringing about the best arrangement suitable to the condition and I can do no more than say I am grateful.

Sincerely,

MARY C. HOULTON."

"March 30, 1911.

My dear Mr. O'Dunne:

I am expecting to come to Baltimore in two or three weeks. My sister, Mrs. Dower, is in Baltimore at the City Hospital operated on by Dr. Dobbin. Mrs. Dower expects to be there three or four weeks and I am going to try and come over for Easter. I am anxious to see the boy and thought this a good time to come. Apart from that I should like to see you on business and I shall call at your office when I come to town. Could you let me know if it will be possible for me to get a divorce from the Dr. in Baltimore or is it a difficult question for you to answer as you are not really my lawyer. However, if you can possibly tell me, I should be very glad. Hoping to hear from you soon.

Sincerely,

MARY C. HOULTON."

Both of these letters must have been promptly communicated to the defendant, for the copies used at the trial and admitted to be genuine, were produced by him, and on April 11, 1911, the following correspondence took place between Dr. Houlton and Mr. O'Dunne:

"Baltimore, April 11, 1911.

My Dear Mr. O'Dunne:

I have read Mrs. Houlton's letter to you of March 30, '11, in which she asks you whether you are at liberty to act as her counsel in any suit that she may see fit to bring against me looking to a divorce.

I see nothing that should deter you from acting as her counsel in any matter now, since the matter for which I sought your counsel is quite closed, and was not inconsistent with your representing her in this matter.

We have both sought advice from you and both have confidence in you, which is more than I can say for the counsel previously representing Mrs. H.

Yours truly,

SAMUEL S. HOULTON."

"Baltimore, Md., April 11, 1911.

Dr. Samuel S. Houlton,
3310 W. North Ave.,
Baltimore.

My Dear Mr. Houlton:

I enclose you the four copies of the letters of Mrs. Houlton to me at the time they bear date, all of which I had shown you when received, with the possible exception of the one of March 8th, which I thought I had shown you, but you say not, but of which I told you the substance because you acted on it at the time. The one of March 30th I had not answered, but your letter to me of today will be forwarded to her.

Yours very truly,

O'D-N EUGENE O'DUNNE."

From that date Mr. O'Dunne has acted as counsel for Mrs. Houlton alone, and, because he has loyally advised and served her to the best of his ability, Dr. Houlton imagines that this amounts to a betrayal of the client by whom he had been previously employed in one special matter then "quite closed" and "not inconsistent" with the new employment. In other words, he complains of loyalty to his wife as treachery to himself, although he had fully consented to the transfer of allegiance; and he now presumes to come into Court and say in substance that his consent was given on the understanding that, while professing to advise and represent the wife, Mr. O'Dunne would really continue to consider first the husband's interest and wishes. This indirectly sheds some light on the defendant's sense of his own obligations as a man and as a husband. The inaccuracy of his memory, or elasticity of his conscience, is illustrated by his account of a meeting between his wife and himself in the summer or fall of 1911. The complainant testified that about the first of October, 1911, for the purpose of trying to effect a reconciliation, she had come to Baltimore and her request for an interview was met with the following reply, dated October 2, 1911:

"Mrs. Mary C. Houlton,
Care S. C. Houlton,
Baltimore, Md.

Dear Mollie:

At 11.45 P. M. this evening I had a 'phone call from the Western Union Telegraph Co., relaying the following message which I take it is from you: 'Meet me if possible. Arrive Congressional Limited, Mollie,' Oct. 2, '11, 9.22 P. M.

My last note to you replying to request for me to meet you at my father's office explained, I think, my position, which I repeat, that in view of the attitude as expressed in a note to Mr. J. P. Bruns, of counsel for me, viz: 'I cannot bring myself to believe that it will be the best thing for me to return to the Doctor. This is, of course, final,' or something to the same effect, I stated that had also reached a final decision, and that I could communicate with you only through counsel, but could not be bound by any arrangement or agreement made by them.

The baby is quite well. You may see him at any time at his present home with Mrs. R. C. Hicks, on Mondawmin avenue, third house south of Garrison avenue, south side.

Yours very truly,

SAML. S. HOULTON."

"October 2, 1911."

She further stated that, in spite of this discouraging reply, the meeting did take place about that time, but was an utter failure and ended in a violent outbreak of temper on the part of her husband. When the defendant took the stand he denied that his wife and child were ever without sufficient food in the house, and stated that the shutting off of gas month after month for non-payment of bills was only because his professional engagements left him no time to attend to such details, and was an accident which might befall any man engaged in professional or scientific work. He then announced, with a cheerful smile, that his wife's account of their meeting was wholly incorrect; that the interview was thoroughly cordial and pleasant and they had been so completely reconciled that they spent the night together at her hotel as man and wife; and on his return the next day from some professional or other engagement, he was amazed to find that she had gone without a word of explanation and without leaving any address; that he had immediately followed her to New York; but could not find her. He was somewhat perplexed to explain a letter in his own handwriting, which, without date, began as follows:

"My dear, dear Mollie:

I cannot express to you the sore regret that I feel for not having received you back again into embrace. I get so disconcerted whenever I think of the horrible circumstances we have both been through that I really am not responsible for my actions and thoughts. You are I must believe still a good girl, you do not deserve the terrible pangs that separation from the baby must entail. Our dear little fellow does not deserve to be left motherless or fatherless; for his sake as well as for the sake of a poor little unfortunate wife, I must retract every word I said to you the last day I saw you. * * *"

After several pages of wild remorse, this letter concludes with an appeal to his wife to return and "let bygones be bygones," but still without any definite offer or prospect of a home or support.

Later the complainant's counsel exhibited another letter which he said must belong to the defendant's file, but had become in some way mixed with the complainant's papers on the trial table, and since he had innocently come into possession of it, he felt justified in laying it before the Court. The defendant questioned the truthfulness of this statement, but admitted that the letter was in his handwriting and bore his signature, and it was then filed as an exhibit and read as follows:

"HOTEL RENNERT,

European Plan—Fireproof.

Edward Davis, Manager.

Baltimore, Oct. 4, 1911.

Dear Mr. Bruns:

I had a very unsatisfactory talk with my wife last night, you will please be circumspect in whatever you say to her in the morning at breakfast. I have notified her that I shall seek my redress in equity for the dissolution of my family and practice. Keep this to yourself. Yrs.,

HOULTON."

Whether or not the defendant also attempted to explain this letter is not now recalled; but it clearly shows that his narrative of the interview was purely imaginative.

It seems useless to prolong this opinion by further recital of evidence that convinced me that if the defendant ever felt any obligation to provide for his wife, the feeling had utterly departed more than three years before

the institution of this suit; that his abandonment of the complainant was deliberate and final, and as the separation has been uninterrupted for the period prescribed by statute and is beyond any reasonable expectation of reconciliation, it would be cruel to condemn the young wife to perpetual bondage. It is enough to say that I will sign a decree granting the complainant a divorce a vinculo matrimonii, with custody of the child, subject to the further order of this Court, and requiring the defendant to pay ten dollars a week as alimony and for the child's support, also subject to further order or orders, but providing that the defendant shall have the right to see the child at reasonable periods.